UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID STEWARD, Personal Representative of the Estate of Thomas F. Birchfield, <br><br> Plaintiff, <br><br> v. <br><br> LSC COMMUNICATIONS PENSION PLAN, as successor to BOWNE PENSION PLAN, <br><br> Defendant. | Case No. 20-cv-3166 <br><br> Hon. Steven C. Seeger |

## MEMORANDUM OPINION AND ORDER

This case involves a claim by the estate of a former employee against a pension plan for annuity benefits. The employee, Thomas Birchfield, received monthly payments until he died in mid-March 2016. The pension plan later issued him a lump-sum payment for the period from April 2016 forward, not knowing that he had passed away. When it heard the news of his passing, the plan cancelled the check, and the estate responded by filing suit.

The pension plan (Defendant LSC Communications Pension Plan) moved for summary judgment. *See* Def.'s Mtn. for Summ. J. (Dckt. No. 14). That motion is granted.

### Background

Thomas Birchfield retired from R.R. Donnelley & Sons and belonged to the company's employee pension plan. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 1, 22 (Dckt. No. 19-1); Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 2 (Dckt. No. 19). R.R. Donnelley & Sons originally sponsored the plan, but LSC Communications Pension Plan has since taken control.

*See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2. The plan gives the Plan Administrator full authority to operate and administer the plan. *Id.* at ¶ 5.

Under the plan, Birchfield received monthly payments as a beneficiary of a Single Life Annuity. *Id.* at ¶¶ 22–24. The plan entitled Birchfield to receive monthly payments until he died. The language of the plan confirmed that the benefits ended when life ended: "Single Life Annuity. A retirement benefit payable in equal monthly payments for each month during the period commencing with the Member's Benefit Starting Date and *ending with the month in which the Member dies* . . . ." *See* Bowne Pension Plan, at 15 (Dckt. No. 13-1, at 20 of 76) (emphasis added). It was, as the name suggests, a "Life" annuity. *Id.*

The payment for each month came on the first day of the month. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 24 (Dckt. No. 19-1). So Birchfield would receive the payment for January on January 1, and would receive the payment for February on February 1, and so on. But if he died on February 15, then the February 1 payment would be his last.[1]

In January 2016, LSC offered a one-time, lump-sum payment option to replace the monthly checks. *Id.* at ¶ 7. LSC distributed an Election Guide, which stated that plan holders could convert their plans as of April 1, 2016, to a single lump-sum payment or a new monthly payment scheme. *Id.* at ¶ 19.

---

[1] In its statement of facts, LSC states that the "final payment that the participant receives from the Plan is paid on the first day of the calendar month during which the participant dies." *See* Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 14-1). As support, LSC points to two things. First, the definition of "Single Life Annuity" refers to the fact that payments "end[] with the month in which the Member dies . . . ." *Id.* at ¶ 23. Second, the plan makes payments on the first day of the month. *Id.* at ¶ 24. In response, the estate takes issue with the notion that the payment on the first of the month is the payment for *that* month. According to the estate, LSC "[p]roposes a conclusion that circumstances of timing of payment and death require the conclusion that the Plan payments are made in arrears. Plaintiff does not agree with that. This is a contractual provision rather than a purchase of an asset and the timing of payments as to other events is not capable of expressing intent." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 19-1). The estate disagrees with LSC's statement, but does not offer any evidence of its own. There is no evidence in the record that each monthly check is anything other than a payment for that particular month. Based on the evidence in the record, Birchfield's check from March 2016 was the check for March 2016.

The Election Guide stated: "You may elect to convert your qualified pension benefit as of April 1, 2016 to: [1] a single lump-sum payment, or [2] a different monthly annuity." *See* Pension Payment Opportunity Under R.R. Donnelley's Pension Plan Election Guide, at 2 (Dckt. No. 13-14, at 22 of 64). Other portions of the Election Guide referred to remaining benefits "as of April 1, 2016." *Id.* at 4 ("The decision to convert your remaining monthly pension payments as of April 1, 2016, to the form of a lump sum or a different monthly annuity under the pension payment opportunity is completely voluntary."); *id.* ("[Y]ou have an opportunity from January 1, 2016 through April 1, 2016, to convert your remaining pension benefit as of April 1, 2016 . . . ."); *id.* at 5 ("You can choose to convert your remaining monthly payments to a single lump-sum payment as of April 1, 2016.").

The guide explained how the plan administrator would calculate the amount of the lump-sum payment. The guide clarified that "[t]he single lump-sum payment is calculated by converting the current monthly pension payments to be made over the remainder of your life (and any beneficiary's life) to a single amount in today's dollars as of April 1, 2016." *Id.* at 6. The new monthly annuity plan also "commenc[ed] April 1, 2016." *Id.*; *see also id.* at 5 (noting that the lump-sum payment would be "[b]ased on a payment date of April 1, 2016").

The participants needed to postmark their elections "no later than April 1, 2016." *Id.* at 10. If the participant selected the lump-sum option before March 9, then the plan administrator would mail the payment "on or about April 1, 2016." *Id.* Participants who mailed election forms after March 9, but before April 1, would receive the lump-sum payment "on or about April 27, 2016." *Id.* (As it turns out, that's the day that LSC mailed the check to Birchfield.)

The guide also included a Benefit Election Form that explained how the payment worked. "Payment of the single lump sum will be effective as of April 1, 2016. I understand that the

3

lump-sum payment will be in lieu of all future monthly payments I and any beneficiary are entitled to receive under the Pension Plan after March 1, 2016 as well as any death benefit. There are no survivor benefits payable to a beneficiary under the lump-sum payment choice. I have enclosed documentation of my date of birth." *See* Benefit Election Form (Dckt. No. 13-14, at 33 of 64); *see also* Pl.'s Resp. to Def.'s Statement of Facts, ¶ 20 (Dckt. No. 19-1). Notice the language in the second sentence – the lump-sum payment was in lieu of future payments that a participant was "entitled to receive" after March 1, 2016. *See* Benefit Election Form.

Birchfield liked what he saw. Sometime between January and March 12, he completed the form and returned it, opting for the lump-sum payment. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 19-1); Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 21).

On March 1, he received his monthly annuity payment, which paid him for March 2016 (only). *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 27 (Dckt. No. 19-1). If Birchfield had continued to live, the March 1 check would have been his last *monthly* payment, because the lump-sum payment covered the period after April 1, 2016. So, if he had continued to live, he would have received only one more check – the lump-sum payment.

But Birchfield never saw another check. Unfortunately, on March 12, 2016, he died. *Id.* at ¶ 28. That same day, LSC received his signed Benefit Election Form, opting into the lump-sum payment plan. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 21).

No one told LSC that Birchfield had died. So the plan began the process of calculating and paying his lump-sum payment.

Meanwhile, on March 31, 2016, LSC formally amended the plan through Amendment 10, which became retroactively effective as of December 1, 2015. *Id.* at ¶¶ 8–9; Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 7–8 (Dckt. No. 19-1). Amendment 10 put into effect the lump-sum

4

payment option that the Election Guide had advertised. That is, before Amendment 10, the plan did not have a lump-sum payment option, and the Election Guide merely served as a preview of what was to come. Through Amendment 10, the preview became reality.

Amendment 10 created a "Retiree Window Benefit" – that is, it created the lump-sum payment option. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 8–9 (Dckt. No. 19-1); Appendix A, at 1 (Dckt. No. 13-11, at 4 of 14). Amendment 10 also defined the eligibility requirements. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 19-1).

For present purposes, the most important requirement was the need to be alive as of April 1, 2016. The text of Amendment 10 expressly provided that a member is eligible only if he or she has "not died on or before March 31, 2016." *See* Appendix A, at 3 (Dckt. No. 13-11, at 6 of 14). That language did not appear in the Election Guide that Birchfield had received.

Under the text of Amendment 10, then, Birchfield did not qualify because he passed away on March 12.

However, LSC still hadn't found out about Birchfield's death. On April 27, 2016, LSC's Service Center issued him a check for $127,697.17. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 30 (Dckt. No. 19-1); Cplt., at ¶ 5 (Dckt. No. 2). So LSC issued the check on the day that it designated in the Election Guide as the day for the lump-sum payment. *See* Pension Payment Opportunity Under R.R. Donnelley's Pension Plan Election Guide, at 10 (Dckt. No. 13-14, at 30 of 64).

The post office returned the check for insufficient address, so the Service Center issued a second check on May 6. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 31 (Dckt. No. 19-1); 4/11/17 Mem., at 2 n.2 (Dckt. No. 13-14, at 14 of 64). By all accounts, that check reached Birchfield's estate.

LSC offered evidence that the check in question was the lump-sum payment. *See* Def.'s Statement of Facts, at ¶ 30 (Dckt. No. 14-1). Specifically, LSC provided letters and memos from its outside counsel, showing that it calculated the amount based on the erroneous assumption that Birchfield was alive and eligible for a lump-sum payment as of April 1, 2016. *See, e.g.*, 8/18/17 Letter, at 2 (Dckt. No. 13-12); 4/21/17 Letter, at 2 (Dckt. No. 13-14, at 8 of 64); 4/11/17 Mem., at 2 & n.2 (Dckt. No. 13-14, at 14 of 64).

The estate disputes "that statement inasmuch as the calculations etc. do not confirm or compel a decision that the amount was necessarily based on an evaluation through April 1, 2016." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 30 (Dckt. No. 19-1). But the estate offers no evidence that LSC calculated the amount of the check differently.

So there is evidence on only one side of the ledger when it comes to the amount of the check, and what it represents. There is no genuine dispute that the April 27 check was the lump-sum payment, calculated as if Birchfield was alive on April 1.

What else could it be? The amount of the six-figure check ($127,697.17) was too big to be the monthly payment. The record doesn't include the amount of the monthly payment, but it is inconceivable that the monthly payment was so big. The check arrived after Birchfield had signed up for the one-time, lump-sum payment. And LSC mailed it on April 27, meaning the date for lump-sum payments as promised in the Election Guide. So it is only natural to conclude that the check for $127,697.17 was the lump-sum payment. There is no evidence supporting any other conclusion.

On May 10, LSC finally learned that Birchfield had died. *See* Def.'s Statement of Facts, at ¶ 29 (Dckt. No. 14-1). Realizing that it mistakenly sent him a payment, LSC's Service Center informed the estate that it would cancel the check. *See* Pl.'s Resp. to Def.'s Statement of Facts,

6

at ¶ 32 (Dckt. No. 19-1). On June 28, an attorney for the estate wrote to the plan "'protesting and Appeal[ing]' the decision to 'cancel'" the lump-sum payments to Birchfield. *Id.* at ¶ 33 (quoting 6/28/16 Letter (Dckt. No. 13-14, at 41–42 of 64)).

In July, LSC responded to the letter and confirmed that Birchfield did not qualify for the payment. "According to the terms of the Pension Plan, since he deceased prior to April 1, 2016, his election is null and void. The value of the benefit was calculated as of April 1, 2016, since the participant did not live to such date, he is not due the benefit. We apologize for any confusion and inconvenience, Mr. Birchfield's check for the Pension Payment Opportunity has been cancelled." *See* 7/13/16 Letter (Dckt. No. 13-14, at 44 of 64); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 19-1).

The personal representative of the estate then spoke with the Plan Administrator's outside counsel,[2] Gregory Marrs, in early August 2016. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 38 (Dckt. No. 19-1). Marrs sent an email to the estate's counsel on August 4, providing (as apparently requested) a copy of Amendment 10 and the Election Guide, plus a description of the claims and appeals process under the pension plan. *Id.* at ¶ 39; 8/4/16 Email (Dckt. No. 13-14, at 46 of 64).

On January 26, 2017, LSC's Service Center received a letter from the estate's attorney appealing the denial of the retirement benefit. *See* Pl.'s Resp. to Def.'s Statement of Facts, at

---

[2] The estate "questions the characterization of 'outside counsel'" because Marrs "was provided briefing and advice in matters in this case." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 38 (Dckt. No. 19-1). The estate does not cite anything when it calls into question whether Marrs was, in reality, outside counsel. The record reveals that Marrs works for Sidley Austin LLP, and provided legal advice to the Plan Administrator. *See, e.g.*, 4/11/17 Mem. (Dckt. No. 13-14, at 13–16 of 64). That's the definition of outside counsel. But either way, it's neither here nor there. Reliance on in-house or outside counsel is not unreasonable.

¶ 40 (Dckt. No. 19-1). The Plan Administrator responded on February 22, stating that it would consider the letter as a formal claim. *Id.* at ¶¶ 41–42.

After review, the Plan Administrator denied the claim on April 21, 2017. *Id.* at ¶ 43; 4/21/17 Letter, at 2 (Dckt. No. 13-14, at 8 of 64). The Plan Administrator offered two reasons. First, "Mr. Birchfield was not a 'Retiree Window Eligible Member' and, therefore Mr. Birchfield was not eligible to participate in the Pension Payment Opportunity." *See* 4/21/17 Letter, at 2. That conclusion rested on the language in Amendment 10 providing that a member is eligible only if he or she has "not died on or before March 31, 2016." *See* Appendix A, at 3 (Dckt. No. 13-11, at 6 of 14).

Second, "even if Mr. Birchfield had been eligible to participate in the Pension Payment Opportunity, no benefit would have been payable to Mr. Birchfield or the Estate under the terms of the Pension Payment Opportunity because Mr. Birchfield did not have a remaining pension benefit from the Plan as of April 1, 2016." *See* 4/21/17 Letter, at 4–5 (Dckt. No. 13-14, at 10–11 of 64). That is, "[b]ased on the form of benefit that Mr. Birchfield was receiving from the Plan and his March 12, 2016 date of death, the final payment Mr. Birchfield was entitled to receive from the plan was paid to Mr. Birchfield on March 1, 2016." *Id.* at 4.

The estate appealed the decision on June 19, 2017. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 46 (Dckt. No. 19-1). On August 17, the Plan Administrator denied the appeal. *Id.* at ¶¶ 51–52.[3] The letter provided the same two reasons for denying the claim, meaning that

---

[3] Defendant asserts that the appellate review followed the plan's proper procedure, and cites the denial of the appeal's explanation letter as proof. *See* Def.'s Statement of Facts, at ¶¶ 49–50 (Dckt. No. 14-1). The estate questions the appeal's procedure, arguing that "upon discovery and review of the documents of the Defendant regarding the proceedings of the review and actions before the committee, Plaintiff asserts that the committee was denied any opportunity to execute the discretion and that it was instructed by its counsel (Mr. Marrs) that it must accept the document as then purported and no information regarding the ex post facto nature of the Complaint by Plaintiff nor of the concept of offer and acceptance in its deliberations." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 49 (Dckt. No. 19-1). Once again,

(1) Birchfield did not qualify as a Retiree Window Eligible Member as explained in Amendment 10, and (2) he had no remaining pension benefit as of April 1, 2016. *See* 8/17/17 Letter, at 2 of 6 (Dckt. No. 13-12).

Years later, in May 2020, the estate sued LSC under section 502(a) of ERISA. *See* Cplt. (Dckt. No. 2); 29 U.S.C. § 1132(a)(1)(B). LSC now moves for summary judgment.

## Legal Standard

A district court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (cleaned up).

The Court "considers all of the evidence in the record in the light most favorable to the non-moving party, and draws all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (cleaned up). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted).

A district court does not review a plan administrator's decision *de novo* if the plan vests the administrator with discretion. Instead, a deferential standard of review applies. "The

---

however, the estate offers no actual evidence to support its claim. So there is no evidentiary basis to call into question the appellate process of the Plan Administrator.

9

standard of judicial review in civil actions under 29 U.S.C. § 1132(a)(1)(B) depends upon the discretion granted to the plan administrator in the plan documents." *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 810 (7th Cir. 2006).

If the plan "clearly and unequivocally state[s] that it grants discretionary authority to the administrator," then the court "lower[s] the level of judicial review from de novo to arbitrary and capricious." *Id.* (quoting *Perugini-Christen v. Homestead Mortgage Co.*, 287 F.3d 624, 626 (7th Cir. 2002)). Arbitrary and capricious review "doesn't make [the Court] a rubber stamp, but it does mean that [it] cannot reverse course unless a decision is 'downright unreasonable.'" *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (quoting *Davis v. Unum Life. Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)).

Here, the parties agree that the plan grants full discretion to the Plan Administrator. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 5–6 (Dckt. No. 19-1). As a result, this Court must ask whether a reasonable jury could find that LSC's decision to deny the benefit was "downright unreasonable."

## Discussion

Based on the undisputed facts, no reasonable jury could conclude that the plan administrator's decision was "downright unreasonable." So this Court grants LSC's motion for summary judgment.

LSC makes two arguments in favor of the denial of benefits. The first argument (and only the first argument) involves the text of Amendment 10. The second argument rests on the overarching principle that benefits end when a member passes away.

The first argument goes as follows. Amendment 10 allows a member to receive the lump-sum payment if that person was a Retiree Window Eligible Member. *See* Appendix A, at 1

10

(Dckt. No. 13-11, at 3 of 14). A participant fits within that definition only if the person has "not died on or before March 31, 2016." *Id.* at 3. So under the plain language of Amendment 10, Birchfield did not qualify.

The Plan Administrator invoked that language in the original denial and in the appeal. The Plan Administrator stated: "Mr. Birchfield was not a 'Retiree Window Eligible Member' and, therefore, Mr. Birchfield was not eligible to participate in the Pension Payment Opportunity." *See* 4/21/17 Letter, at 2 (Dckt. No. 13-14, at 8 of 64).

The estate maintains that the amendment cannot apply to Birchfield because he accepted the lump-sum payment option on March 12, 2016, before the adoption of Amendment 10 on March 31, 2016. In the estate's view, the plan could not change the rules for an election after the election took place. The amendment's retroactive application, therefore, deprived him of a benefit. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 5–8 (Dckt. No. 19).

The plan responds that Amendment 10 *created* the benefit on March 31, 2016. *See* Def.'s Reply in Further Support of its Mtn. for Summ. J., at 4–7 (Dckt. No. 20). That is, before the adoption of Amendment 10 on March 31, 2016, the plan was merely advertising what was to come. The Benefit Election Guide was a sneak peek, meaning a preview of an upcoming change that the plan had not yet adopted. When Birchfield signed the election form, the plan had not yet approved the lump-sum payment option. So, in the plan's view, the plan could add clarifying language in Amendment 10 on March 31, 2016, because the plan hadn't adopted anything yet anyway.

So the parties have a dispute about the impact of the language of Amendment 10. LSC points to language in Amendment 10 about the need to stay alive until April 1, and the estate responds that post-election language cannot control.

11

But this Court does not need to reach that issue, because the plan also rests its decision on a more basic argument. That is, the Court does not need to reach the impact of the language in Amendment 10 because LSC offered a second rationale that survives scrutiny.

LSC's second argument rests on the fact that a member has no right to monthly benefits when that member passes away. The lump-sum payment accelerated future payments. But to get that payment, the member needed to be alive on day one. Without a right to *something*, the member wasn't entitled to *anything*. And on April 1, 2016, Birchfield was entitled to *nothing*.

The text of Birchfield's pension plan confirms that a Single Life Annuity ends during "the month in which the Member dies." *See* Bowne Pension Plan, at 15 (Dckt. No. 13-1, at 20 of 76). Birchfield died in March, so his pension ended in March. Birchfield wasn't entitled to anything on April 1, 2016, because he wasn't alive on April 1, 2016.

As the plan put it, Birchfield "did not have a remaining pension benefit from the Plan as of April 1, 2016." *See* 4/21/17 Letter, at 2 (Dckt. No. 13-14, at 8 of 64).[4] When he passed away in March, Birchfield had no right to payments from April 1 forward.

The plan administrator decided that April 1 was the starting point, meaning that a member needed to be eligible for an April payment to be eligible for a payment from April 1 *forward*. That starting point did not come out of nowhere. In fact, Birchfield received materials that alluded to that starting point. The Election Guide itself referred to payments *as of April 1*, 2016. *See* Pension Payment Opportunity Under R.R. Donnelley's Pension Plan Election Guide,

---

[4] The estate tries to downplay this second reason, arguing "that language is in there but states that the first reason given and presumably the primary reason was the failure of Plaintiff to survive to and including March 31, 2016." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 45 (Dckt. No. 19-1). The estate is correct that Birchfield's death is the first reason given, but the Administrator's denial spends one paragraph on each reason and suggests that both are distinct but equally possible rationales. *See* 4/21/17 Letter, at 4–5 (Dckt. No. 13-14, at 10–11 of 64).

12

at 4 (Dckt. No. 13-14, at 22, 24–25 of 64) ("[Y]ou have an opportunity from January 1, 2016 through April 1, 2016, to convert your remaining pension benefit as of April 1, 2016 . . . ."); *id.* ("The decision to convert your remaining monthly pension payments as of April 1, 2016, to the form of a lump sum or a different monthly annuity under the pension payment opportunity is completely voluntary."); *see also id.* at 2, 5. But Birchfield *had no* "remaining monthly pension payments" as of April 1, 2016, because he passed away in March.

Even if Amendment 10 did not exist, Birchfield was not entitled to a lump-sum payment as of April 1 because he was not alive on April 1. Under the plan *before* the adoption of Amendment 10 on March 31, 2016, he wasn't entitled to anything on April 1 if he wasn't alive on April 1.

The plan's conclusion finds support in the text of the Benefit Election Form, meaning the form that Birchfield completed before his passing. The Form states that "[p]ayment of the single lump sum will be effective as of April 1, 2016" and "in lieu of all future monthly payments I and any beneficiary are *entitled to receive* under the Pension Plan after March 1, 2016 as well as any death benefit." *See* Benefit Election Form (Dckt. No. 13-14, at 33 of 64) (emphasis added).

Birchfield received his March 1 pension payment and died that month. The lump-sum payment would cover "all future monthly payments" that he was "entitled to receive" after "March 1, 2016." But after March 1, 2016, Birchfield wasn't entitled to receive *any* monthly payments, because he passed away before the next monthly payment. So "as of April 1," he had no pension – and there was nothing to receive. A single penny would be a windfall.

Consider the same situation from a different angle. Imagine if Birchfield had not elected the lump-sum payment at all. That is, imagine if he had decided to continue receiving monthly

13

payments. When he died on March 12, he lost the right to a monthly payment in April, and he lost the right to all future monthly payments, too. So his estate would have received nothing.

The lump-sum payment accelerated future monthly payments – but to receive *everything*, he needed to be entitled to receive *something*. That is, he needed to be eligible to receive the first monthly payment (on April 1) to receive all future monthly payments. He needed to be in for a penny to be in for a pound.

Maybe the Plan Administrator could have made a different decision. Maybe the Plan Administrator could have decided that a member had a vested right to a lump-sum payment as soon as the member returned the form. But the language of the plan itself does not compel that conclusion. The plan administrator made the decision that a beneficiary had to be eligible for *something* to get *anything*. The beneficiary needed to stay alive until April 1 (and thus vest for the month of April) to vest for all future payments.

Every payment plan needs a starting point, and here, the Plan Administrator decided that the starting point for eligibility was April 1, 2016. That decision was far from "downright unreasonable." Nothing in the plan foreclosed the administrator from drawing the line where it did.

The estate points out that the plan "failed to give Mr. Birchfield notice of the subsequently amended requirement that he 'not die before March 31, 2016.'" *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 4 (Dckt. No. 19). Not so. The plan makes clear that monthly payments end when "the Member dies." *See* Bowne Pension Plan, at 15 (Dckt. No. 13-1, at 20 of 76). Staying alive was a basic requirement of receiving benefits from day one.

Even if, for the sake of argument, he lacked notice, he suffered no harm. Imagine if the plan had sent Birchfield a letter on day one, saying that he needed to live until April 1, 2016 to

14

collect the lump-sum payment. And imagine if that requirement persuaded Birchfield not to take the lump-sum payment. In that scenario, he would have stuck with the monthly payments. And he would have gotten nothing. Birchfield would not have been eligible for a monthly payment in April 2016 because he wasn't alive on April 1, 2016. So any notice issue cost him $0.

The estate makes two final arguments. First, the estate takes issue with the Plan Administrator's reliance on counsel. The estate argues that LSC's outside counsel improperly instructed the Plan Administrator by failing to thoroughly discuss the illegality of Amendment 10. The estate also argues that LSC acted unreasonably by simply assuming that counsel's memos were right and adopting his reasoning.

The estate offers no evidence that the Plan Administrator "assumed as true" Marrs's memos. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 9 (Dckt. No. 19). And consulting counsel about the applicability of a pension plan is a far cry from "downright unreasonable." *See, e.g.*, *Gorbacheva v. Abbott Labs. Extended Disability Plan*, 309 F. Supp. 3d 756, 770 (N.D. Cal. 2018) ("[T]he Plan Administrator's consultation with counsel was not procedurally improper."); *Gill v Bausch & Lomb Supplemental Retirement Income Plan I*, 1 F. Supp. 3d 72, 92 (W.D.N.Y. 2014) ("'[N]othing set forth in ERISA prohibits plan administrators from relying on information provided by and following the recommendations of either in-house or outside attorneys for the employer who sponsors the plan.'") (quoting *Ford v. Motorola Inc. Involuntary Severance Plan*, 2007 WL 162680, at *6 (D. Ariz. 2007)).

Second, the estate argues that courts use ordinary principles of contract law when interpreting ERISA plans, and the Benefit Election Form was an accepted offer, creating a contract. *See M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) ("We interpret collective-bargaining agreements, including those establishing ERISA plans, according to

ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy.").

Even if the Benefit Election Form were a formal contract, the plain language of the form necessarily denies Birchfield any payment after April 1, 2016. The offer was a lump-sum payment for any amount due as of April 1, 2016. *See* Pension Payment Opportunity Under R.R. Donnelley's Pension Plan Election Guide, at 2 (Dckt. No. 13-14, at 22 of 64). The acceptance mirrored that offer. *See* Benefit Election Form (Dckt. No. 13-14, at 33 of 64). So even if it is viewed as a contract, the contract was for $0 because he died before April 1, 2016. Again, as the Plan Administrator's reasoning explicitly states, "even if Mr. Birchfield had been eligible to participate in the Pension Payment Opportunity, no benefit would have been payable to Mr. Birchfield or the Estate under the terms of the Pension Payment Opportunity because Mr. Birchfield did not have a remaining pension benefit from the Plan as of April 1, 2016." *See* 4/21/17 Letter, at 4–5 (Dckt. No. 13-14, at 10–11 of 64).

Birchfield died on March 12, 2016, and his pension ended then and there. He had no right to annuity benefits for the period when he wasn't alive. His March 1 payment should have been his last, so LSC properly cancelled a check sent months later. There is no evidence in the record that the plan's decision was downright unreasonable.

## Conclusion

For these reasons, the LSC's motion for summary judgment is granted.

Date:  September 17, 2021

Steven C. Seeger
United States District Judge

16